## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DANIEL PETERSON,**

   **Plaintiff,**

    **v.**

**MINERVA SURGICAL, INC.,**
**DAVID CLAPPER, THOMAS PENDLEBURY,**
**GORDON REES SCULLY MANSUKHANI, LLP,**
**MICHAEL LAURENSON, AMBER EKLOF,**
**and TONY SHAPIRO,**

   **Defendants.**

**CIVIL ACTION**

## COMPLAINT
For Fraud on the Court (Equitable Claim)
and Civil Conspiracy and Aiding and Abetting (Supplemental State-law Claims).

### PARTIES

1. Plaintiff Daniel Peterson is an individual who is domiciled in Olathe, Kansas.

2. Defendant Minerva Surgical, Inc. is a Delaware corporation with its principal place of business in Santa Clara, California.

3. Defendant David Clapper is Minerva's former Chief Executive Officer (CEO) and a former member of its Board of Directors. He is domiciled in Midlothian, Virginia.

4. Defendant Thomas Pendlebury is Minerva's former Vice President of Sales and Marketing. He is domiciled in Lebanon, New Jersey.

5. Defendant Gordon Rees Scully Mansukhani, LLP (GRSM50) is a limited liability partnership with offices in all fifty states.

6. Defendant Michael Laurenson is a GRSM50 partner domiciled in Lafayette, California.

7. Defendant Amber Eklof is a GRSM50 partner domiciled in San Francisco, California.

8. Defendant Tony Shapiro is a former GRSM50 attorney domiciled in Leawood, Kansas.

## JURISDICTION AND VENUE

### I.    Subject Matter Jurisdiction

9.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question: fraud on the court.

10.    Fraud on the court is an independent equitable claim arising from the Court's inherent authority to protect the integrity of its own proceedings, including the power to set aside judgments procured through known falsehoods that undermined the judicial process.

11.    This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Peterson's state-law claims for civil conspiracy and aiding and abetting, which arise from the same case or controversy as the fraud on the court claim as they share a common nucleus of operative fact.

12.    Both state-law claims are independent but related causes of action, each anchored to fraud on the court as the underlying actionable wrong.

### II.    Personal Jurisdiction

13.    Defendants purposefully directed their conduct toward this forum by invoking and defending judicial proceedings in this Court. These actions establish sufficient minimum contacts to support the exercise of personal jurisdiction.

14.    Minerva, Clapper, and Pendlebury remained directly involved in litigation activity from post-award proceedings in this Court through the petition for writ of certiorari in the United States Supreme Court, working throughout with GRSM50's counsel.

15.    After the Board of Directors appointed Clapper's successor as CEO, Clapper continued to participate in Minerva's post-award litigation activities in this Court in an advisory capacity.

16.    Pendlebury remained actively involved as a Minerva executive during post-award proceedings in this Court, collaborating with Clapper on matters related to federal litigation.

17.     GRSM50 attorney Shapiro, a Kansas-licensed lawyer with an office in this District, was counsel of record in this Court and in the Tenth Circuit appeal.

18.     While obtaining confirmation of the award in this Court and defending it on appeal, Shapiro coordinated with GRSM50 attorneys Laurenson and Eklof on litigation matters.

19.     After Shapiro withdrew, GRSM50 continued to represent Minerva in connection with Peterson's petition for a writ of certiorari before the United States Supreme Court.

20.     Laurenson and Eklof jointly represented Minerva throughout that proceeding, with Eklof listed as counsel of record.

21.     On February 24, 2025, the United States Supreme Court denied the petition for certiorari.

22.     Two days later, the Tenth Circuit transmitted formal notice of denial to this Court, reaffirming this Court as the forum where final judgment was entered and remains in effect.

23.     For these reasons, the exercise of personal jurisdiction over all Defendants is proper and consistent with due process under the Fifth Amendment for the federal claim and under the Fourteenth Amendment for the state-law claims.

### III.    Venue

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including proceedings in which Defendants sought and obtained confirmation of the arbitration award.

25.     Peterson designates Kansas City, Kansas, as the place of trial.

### FACTUAL ALLEGATIONS

### I.    Background about Minerva and Peterson.

26.     Minerva began as a single-product medical device company.

27.     Its business depended entirely on a single product—a women's health device that carried the company's name, "Minerva."

28.     The device treats abnormal uterine bleeding through endometrial ablation, a procedure that uses thermal energy to destroy the uterine lining.

29.     Uterine perforation—a known complication involving a hole in the uterine wall—can lead to thermal injury of adjacent organs such as the bowel.

30.     Such bowel injuries are potentially life-threatening.

31.     In July 2015, after the Food and Drug Administration (FDA) approved the device, Minerva offered Peterson employment as a Territory Manager.

32.     Peterson had previously worked with then-CEO Clapper in a professional capacity for more than a decade and had also developed a close personal relationship with him.

33.     As a condition of employment, Minerva required Peterson to sign an arbitration agreement.

34.     The agreement contained confidentiality provisions and expressly barred court proceedings for any employment-related disputes.

35.     It designated Judicial Arbitration and Mediation Services, Inc. (JAMS) as the sole forum and exclusive remedy for disputes between Minerva and its employees.

36.     JAMS is a private, for-profit company that charges fees for its administrative and adjudicative services, including conducting hearings, deciding disputes, and issuing awards.

37.     Under the agreement, Minerva assumed responsibility for paying JAMS's fees.

38.     The only fee Minerva did not cover was the filing fee, which the agreement required the employee to pay if initiating the arbitration.

39.     The agreement stated that an arbitrator's award would be final and binding, with no right of appeal or judicial review of the arbitrator's findings.

40.     It also authorized the arbitrator to award costs and fees, including attorneys' fees, to the prevailing party.

41.     The agreement further provided that an award could be entered as a judgment in any court with jurisdiction, converting a private, non-reviewable award into an enforceable court order.

42.     Shortly after signing the agreement and beginning employment, Peterson secured Minerva's first sale, which included a stocking order of the company's self-named medical device and the controller, the capital equipment required to operate the device.

43.     Minerva then asked Peterson to assist its engineering team in evaluating device performance and safety, serving as a liaison between sales and engineering.

44.     After each procedure, Peterson provided the engineering team with detailed feedback and procedural data to evaluate device performance and identify potential safety concerns.

45.     By October 2015, Peterson was regarded within the company as a clinical and safety resource, with responsibilities spanning sales, training, and engineering support.

46.     After FDA approval based on controlled clinical studies, bowel burns were reported during commercial use.

47.     Unlike the controlled studies, commercial use reflected real-world conditions in which Minerva could not control patient selection or troubleshoot each case, including system errors related to perforation detection.

48.     These incidents led Peterson to consider whether the device had a design flaw that increased the risk of patient injury.

49.     He hypothesized that the silicone array may have sealed uterine perforations, making them undetectable during procedures.

50.     Peterson believed the array—constructed from silicone, a sealant—was masking perforations by plugging them and thereby hiding their presence.

51.    In or around January 2016, Peterson sketched a concept to add extension tubing to the device, believing this modification could improve perforation detection.

52.    He shared the snorkel-style design with Clapper, explaining that the extension tubes might help identify perforations and reduce the risk of injury.

53.    They referred to it as the "snorkel" design because the tubes functioned like a snorkel from the uterus to the abdomen, the location of the bowel and other vital organs.

54.    Clapper relayed the concept to Minerva's engineering team.

55.    Working with Clapper, the engineering team developed a prototype with extension tubes.

56.    In April 2016, Minerva promoted Peterson to Area Sales Director.

57.    Around that time, members of the sales team raised concerns about Minerva's direction and the safety of its device, which Peterson relayed to Clapper.

58.    Clapper referred to the group as a "mutiny."

59.    He told Peterson, "This is not management by committee," and warned that employees who questioned his direction or the device's safety would be terminated.

60.    In subsequent conversations, Clapper described his approach to employment disputes, which relied on arbitration, confidentiality agreements, and employment liability insurance.

61.    In October 2016, Minerva submitted to the FDA a premarket approval (PMA) supplement (No. P140013/S005) for a redesigned device, which requested approval for "the addition of a $CO_2$ extension tube."

62.    By December 2016, Peterson informed Minerva's engineering department that the sales team needed updates and feedback regarding product and safety complaints.

63.    Peterson also reported to Minerva that he believed a defect in the device was contributing to patient injuries.

64.     That same month, Minerva filed U.S. Patent Application No. 15/418,635, entitled, "Systems and Methods for Evaluating the Integrity of the Uterine Cavity."

65.     The application filed with the United States Patent and Trademark Office (USPTO) included the addition of extension tubing similar to the design sketch Peterson had shared with Clapper one year earlier.

66.     The application listed Clapper and members of the engineering team as inventors, but did not include Peterson.

67.     In January 2017, Peterson and other sales directors cautioned Minerva against attributing patient injuries solely to physician technique or sales training.

68.     In May 2017, the FDA approved Minerva's redesigned device, which incorporated extension tubes and replaced the original version.

69.     The updated design was called the Minerva ES, denoting "efficacy" and "safety."

70.     In January 2018, at a national sales meeting, Minerva informed its sales team that the original device was associated with patient injuries caused by a defect.

71.     Minerva explained that the defect allowed uterine perforations to go undetected, leading to patient injuries, specifically bowel burns.

72.     Minerva instructed the sales team to keep this information confidential.

73.     Peterson recommended removing all remaining inventory of the original device and replacing it with the Minerva ES to address safety concerns and prevent avoidable injuries.

74.     This recommendation was consistent with the FDA's expectations.

75.     Under 21 C.F.R. § 7.40, the FDA expects medical device manufacturers and distributors to "carry out their responsibility to protect the public health and well-being from products that present a risk of injury or gross deception or are otherwise defective."

76.    Minerva did not act on Peterson's recommendation. It neither recalled nor removed the remaining inventory of the original device.

77.    Minerva implemented a policy that prohibited sales personnel from documenting safety concerns about the original device.

78.    Peterson objected to the policy.

79.    In April 2018, despite the policy, Peterson documented his safety concerns in writing.

80.     In that communication, Peterson again urged that all remaining inventory of the original device be replaced with the redesigned device to prevent further patient injuries.

81.    Peterson went on unpaid leave after this communication and did not return.

82.    While the parties dispute the circumstances of Peterson's departure, it is undisputed that his employment with Minerva ended.

83.    In August 2023, a JAMS arbitrator issued an award against Peterson in favor of Minerva in the amount of $198,558.94 for attorney fees and costs.

84.    Minerva moved this Court to confirm the arbitration award.

85.    Applying the Federal Arbitration Act (FAA), this Court entered judgment confirming the award, thereby converting a private award into an enforceable federal judgment.

**II.    Minerva knew perforation detection was essential to patient safety and central to Peterson's whistleblower claim.**

86.    The FDA's Summary of Safety and Effectiveness Data (SSED) for Minerva's device underscored the importance of detecting uterine perforation. It stated:

> The Uterine Integrity Test verifies that there are no perforations or holes in the uterine wall.

87.    Detecting uterine perforation was not optional. It was a fundamental safety requirement and a condition of FDA approval.

88. Minerva's Operator's Manual contains a "**WARNINGS**" section titled "Uterine Perforation," with emphasis in original:

    (a)    "Use caution not to perforate the uterine wall."

    (b)    "Activation of the [device] … in the setting of a uterine perforation is likely to result in serious patient injury."

    (c)    "IF THE UTERINE INTEGRITY TEST FAILS AFTER REASONABLE ATTEMPTS TO IMPLEMENT THE TROUBLESHOOTING PROCEDURES, ABORT THE PROCEDURE."

    (d)    "IF A UTERINE PERFORATION IS SUSPECTED AND/OR CONFIRMED, THE PROCEDURE SHOULD BE TERMINATED IMMEDIATELY."

    (e)    "**Post-treatment, any patient reporting signs/symptoms that could indicate a serious complication, e.g., bowel injury, should be thoroughly evaluated without delay.**"

89. The Manual reiterated this point when addressing why patients with "abnormal or obstructed cavities were excluded from the clinical studies of the Minerva System." It explained:

> **The risk of uterine perforation and serious complications (e.g., bowel injury) during endometrial ablation is likely increased in such patients.**

90. The Manual's "**TROUBLESHOOTING**" section reinforced the same message:

> **WARNING: If a perforation is suspected, the procedure should be terminated immediately.**

91. The Manual again emphasized the risk in a section titled "**Suspected Uterine Perforation**," directing clinicians to "[t]erminate the procedure," "[a]ssure patient stability," "[c]onsider patient work-up for perforation," and "[r]eschedule procedure, if appropriate."

92.    The Manual further cautioned that if the procedure is performed in the presence of perforation, clinicians should "[r]ule out visceral injury."

93.    A visceral injury is damage to internal organs, such as the bowel.

94.    Minerva's Instructions for Use (IFU) contained the same warnings, including:

Activation of the [device] ... in the setting of a uterine perforation is likely to result in serious patient injury.

95.    Like the Operator's Manual, the IFU explained why certain patients were excluded from clinical studies: they faced a higher risk of uterine perforation and, therefore, a greater likelihood of serious adverse events, including bowel injury.

96.    Minerva's public-facing materials echoed these warnings. Its website stated:

If the UTERINE integrity TEST fails after reasonable attempts to implement the troubleshooting procedures, abort the procedure.

97.    These materials show that both regulators and Minerva recognized that reliable detection of uterine perforation was critical to patient safety.

98.    Accordingly, Peterson's patient safety concerns were reasonable if the original device did not reliably detect uterine perforations.

99.    They also show that Minerva knew reliable perforation detection was essential and that whistleblowing would be reasonable if the device did not accurately detect perforations.

III.    **Federal court evidence shows Defendants sought confirmation knowing the award rested on falsehoods about device safety, and they used those falsehoods to eliminate Peterson's whistleblower protection.**

100.    In seeking confirmation of the arbitration award, Defendants placed the private award into the federal record by attaching it to their motion to confirm.

101.    By placing the award in the public record, Minerva adopted its findings as its position before this Court, on appeal to the Tenth Circuit, and in the United States Supreme Court.

102.    Those findings stated that there was "nothing unsafe" about the original device and that Peterson's whistleblowing based on safety concerns was unreasonable.

103.    Defendants knew their position was false, yet they invoked this Court's authority to obtain a judgment confirming the award, even though the arbitrator's findings rested on those falsehoods.

104.    This Court granted the motion and confirmed the award.

105.    That confirmation converted a private arbitration award into an enforceable federal judgment, carrying the authority of an Article III court under the United States Constitution.

106.    The federal court record contains documents and sworn statements showing that the original device did not reliably detect uterine perforations and posed risks to patient safety.

107.    Some of these materials, such as patent filings, were always publicly available. Others entered the record when this Court denied sealing requests.

108.    In denying the motions to seal, this Court explained:

    (a)    "This right stems from the fundamental public interest in understanding disputes that are presented to a public forum for resolution."

    (b)    "[T]he Court weighs the public interest, which it presumes is paramount, against the interests advanced by the parties."

109.    By placing these materials in the record, this Court ensured that both Minerva and its attorneys were aware of them.

110.    The materials underscored the significance of the original device's defect and showed that Defendants understood the risks it posed to patient safety.

111.    In emphasizing the importance of these materials, this Court explained that "public interest in court proceedings includes the assurance that courts are run fairly."

112.    These materials establish that Defendants knew Minerva's original device did not reliably detect uterine perforations and posed serious risks to patient safety.

113.    The following subsections summarize categories of documents—consisting of Minerva's own records and admissions through its legal counsel—that are part of the federal court record.

### A.    Minerva's internal animal testing showed that the original device masked uterine perforations, preventing reliable detection and causing risks of patient injury.

114.    Minerva's engineering team conducted studies on excised porcine (pig) uteri showing that the original device masked uterine perforations. The silicone array sealed perforations, making them undetectable and creating risks of serious injury.

115.    Minerva confidentially presented these findings to its sales team, including images of perforated pig uteri where the original device's silicone array sealed perforations while the redesigned device detected them.

116.    These internal studies demonstrated that the original device posed risks of serious injury.

117.    In response, Minerva redesigned the device and developed marketing materials emphasizing that the redesign improved uterine perforation detection and patient safety because the original device failed to reliably detect perforations.

### B.    Marketing materials emphasized that the redesign corrected a defect by improving perforation detection.

118.    In preparation for FDA approval of the redesigned device (Minerva ES), Minerva created marketing materials to highlight improvements in perforation detection over the original device.

119.    Although the FDA approved the ES device for commercial use, it restricted its sale and distribution "to provide reasonable assurance of the safety and effectiveness of the device."

120.    While assuring the FDA that the redesigned device was safe, Minerva continued distributing and selling the original device.

121.    At the same time, Minerva's materials included side-by-side images comparing the original device with the Minerva ES.

122.    One image contrasted "**Perforation Not Detected**" with "**Perforation Detected**," both bolded as shown in Minerva's own materials, illustrating the difference between the two devices.

123.    After Peterson cautioned that the marketing materials could be interpreted as acknowledging a safety issue with the original device, Minerva chose to keep them confidential.

124.    At the same time, Minerva acknowledged the same defect in its patent filings, even as those materials were withheld from healthcare professionals and patients.

    **C.    Minerva's patent filings acknowledged that the original device had a defect that was known to put patients at risk of "very serious and potentially life-threatening" injury.**

125.    Minerva submitted a sworn declaration to the USPTO attesting to the truth of its statements about the original device and the redesign, which included the following declaration:

> I … declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

126.    When the USPTO issued the patent, it publicly disclosed the following statements regarding the original device and the redesign:

    (a)    The original device contained a defect because it "plugs the perforation," causing the uterus to be "characterized … as non-perforated when there is a perforation."

    (b)    This device defect "would likely cause thermal injury to organs within the abdominal cavity."

    (c)    "Such an injury to organs in the patient's abdominal cavity could be very serious and potentially life-threatening."

(d)     The redesigned device "solve[d] the problem of mischaracterizing the integrity of the uterine cavity."

(e)     With the new design, the "perforation will be detected easily."

(f)     Once a perforation is detected, "the physician then will know not to perform an ablation procedure."

127.     Minerva conducted internal studies, both before and after applying for the patent, to evaluate how the defect in the original device affected patient safety.

128.     Having acknowledged in its patent filings that the defect created a risk of "very serious and potentially life-threatening" injury, Minerva then extended its testing to patients.

**D.     Patient studies revealed the original device's defect caused bowel injuries, but the redesign prevented them.**

129.     After FDA approval of the Minerva ES device, Minerva conducted additional testing on patients without disclosing the original device's defect or the risks it created.

130.     Minerva called the study the "Minerva ES Market Preference Evaluation."

131.     The study evaluated user preference for a design that addressed a defect capable of causing patient injuries, even though safety is a baseline expectation rather than a matter of preference.

132.     In an internal email, Minerva described a case in which the ES design identified a uterine perforation, stating:

> So far it's going great! … This includes cases with the Minerva ES as well as … a case where an actual perforation was easily detected.

133.     Minerva confidentially presented the patient study results to its sales team, showing zero bowel burns with the redesigned ES device compared to at least thirteen bowel burns with the original device, which failed to reliably detect perforations.

134.     These patient results confirmed what Minerva's earlier animal studies and internal marketing materials had already shown: the original device's defect posed a serious risk of injury.

**E.    This Court acknowledged—and the Tenth Circuit supplemented into the record—the truth of Minerva's sworn USPTO statements.**

135.    In opposing Peterson's motion to vacate, Defendants argued that this Court lacked power to consider whether Minerva's device was flawed.

136.    They further argued that, under the FAA, the existence of contrary evidence was not grounds for vacating an arbitration award.

137.    While accepting Defendants' FAA arguments, this Court confirmed the arbitration award and entered judgment for Defendants.

138.    In a subsequent order, the Court stated:

> Minerva testified that it signed United States Patent Application No. US 15/418,635 because it believed all statements within the application were true.

139.    On its own motion, the Tenth Circuit supplemented the appellate record to include, as truth, Minerva's sworn declaration to the USPTO.

140.    In doing so, both this Court and the Tenth Circuit acknowledged Minerva's USPTO filings admitting that the original device had a defect capable of causing serious injury.

141.    Yet while invoking FAA limits on judicial review to secure confirmation of the award, Defendants relied on factual representations that contradicted those sworn admissions.

142.    Defendants later admitted to the Tenth Circuit that the original device caused patient injuries, while continuing to argue that this Court had correctly confirmed an award based on the irreconcilable premise that there was "nothing unsafe" about the device.

**F.    After the courts acknowledged the truth of Minerva's sworn statements to the USPTO, Minerva admitted that the original device was defective and caused patient injuries.**

143.    After the Tenth Circuit supplemented the record with Minerva's sworn USPTO declaration about the original device, Minerva—through GRSM50 attorney Shapiro—changed its position.

144.    In its Tenth Circuit briefing, Minerva acknowledged the safety defect in the original device and its connection to Peterson's whistleblower retaliation claim, stating:

(a)    Minerva "worked on product improvements, particularly in response to reports of injuries to patients caused by perforations to the uterus that had not been detected … because of limitations in the product design."

(b)    "Minerva's engineering team sought improvements [to the original device] that would reduce the likelihood of [injury due to undetected] perforations and, after months of brainstorming, testing and studies, the 'Minerva ES' was patented and approved by the FDA."

(c)    "Pendlebury … criticized Peterson for communicating product concerns in writing [because he] took the customer's position and advocated for the exchange of devices based on reasons related to comparative incidents of injury."

145.    In the same briefing, Defendants further acknowledged that "nearly all of Peterson's claims required him to prove an adverse employment action resulted from his engaging in protected activity," making whistleblower protection the core issue.

146.    This concession directly tied the case to whether Peterson had a reasonable belief of a safety defect—an issue Defendants simultaneously told the courts was "completely irrelevant."

147.    As a result, the Tenth Circuit affirmed under the limits of the FAA.

**IV.    Despite Defendants changing position and conceding the defect that caused patient injuries, the award remained an enforceable federal judgment.**

148.    In their post-award briefing, Defendants argued that "determining whether the medical device was flawed is not the role of this Court" and that "the existence of contrary evidence… is not grounds for vacating an arbitration award."

149.    This Court confirmed the award, explaining that, given the FAA's limited scope of review and the deference owed to arbitrators, it could not evaluate the merits of the award or review the arbitrator's factual findings about device safety.

150.    The Tenth Circuit affirmed, stating that under the FAA it lacked both the power and the discretion to review the arbitrator's factual findings:

(a)    "[W]e do not have discretion to overturn them."

(b)    "[F]ederal courts do not have power to review an arbitrator's factual findings."

(c)    "[W]e have no power to review that finding."

151.    Defendants secured an enforceable federal judgment by invoking courts that acknowledged they lacked discretion and power to review the factual basis of that judgment.

152.    In so doing, Minerva—through its GRSM50 legal team—converted a private arbitration award, obtained through known falsehoods about device safety that eliminated whistleblower protection, into an enforceable federal judgment.

## LEGAL BASIS FOR THIS ACTION

### I.    Federal authority and public policy support this action.

153.    Under the Constitution, federal courts retain inherent authority to protect the integrity of their own proceedings, including setting aside judgments procured through fraud on the court.

154.    The FAA limits judicial review of arbitral findings but does not displace a federal court's inherent authority to remedy fraud on the court.

155.    Public policy likewise supports this authority, as Congress has codified whistleblower protections for individuals who raise safety concerns in good faith.

### II.    Claim preclusion and issue preclusion do not apply.

156.    Claim preclusion does not apply because this action is an independent equitable claim for fraud on the court, which was not and could not have been adjudicated in prior proceedings.

157.    Issue preclusion does not apply because no court has ever adjudicated the factual merits of device safety or the reasonableness of Peterson's safety concerns, and Peterson had no full and fair opportunity to litigate them.

### III.    The FAA does not preempt claims of fraud on the court or post-award misconduct.

158.    This action is independent of the arbitration itself and arises from Defendants' conduct in judicial proceedings. It does not seek review of the arbitrator's factual findings, but instead addresses misconduct in the use of this Court's authority to confirm the award, which Defendants knew rested on a false foundation.

159.    The FAA does not displace a federal court's inherent authority to protect the integrity of its own proceedings. Exercising that authority includes setting aside a judgment procured through fraud on the court. The effect of that relief may be to undo confirmation of the award, but the basis is distinct: preserving the integrity of judicial proceedings, not revisiting the merits of arbitration.

The following Counts set forth these claims.

## COUNT I: FRAUD ON THE COURT
Equitable Claim
Against All Defendants

160.    Peterson incorporates by reference all preceding paragraphs as if fully set forth herein.

161.    Fraud on the court requires: (1) a false representation or deliberate concealment of a material fact; (2) made knowingly; (3) that interfered with the court's ability to make an informed decision; and (4) resulting damage.

162.    Each element is satisfied by the following factual allegations.

**Element I: False Representation or Deliberate Concealment**

163.    Defendants invoked this Court's authority to confirm the arbitration award and, in doing so, placed the award into the judicial record to highlight its statement that there was "nothing unsafe" about Minerva's original device.

164.    Defendants invoked the FAA's limits on judicial review to argue that contrary evidence was irrelevant and beyond this Court's review, which prevented the Court from considering it.

165.    Defendants also relied on the award's characterization of Peterson's concerns as unreasonable when presenting the award to this Court, which had the effect of removing whistleblower protection.

166.    In opposing Peterson's motion to vacate, Defendants filed the private arbitration award as a public exhibit, disclosing what had been a confidential proceeding and making its "nothing unsafe" findings part of the federal record.

167.    During post-award litigation, Defendants further argued that "determining whether the medical device was flawed is not the role of this Court" and that "the existence of contrary evidence … is not grounds for vacating an arbitration award."

168.    In their Tenth Circuit briefing, Defendants acknowledged that "nearly all of Peterson's claims required him to prove an adverse employment action resulted from his engaging in protected activity," which made whistleblower protection the central issue.

169.    That acknowledgment directly tied the case to whether Peterson had a reasonable belief of a safety defect—an issue Defendants simultaneously told the courts was "completely irrelevant."

170.    Even after later admitting that the original device was defective and caused patient injuries, Defendants persisted in arguing that the device's safety was immaterial to confirmation of the award—an award that itself rested on representations of "nothing unsafe" and on discrediting Peterson's whistleblower protection.

**Element II: Knowledge**

171.    Defendants knew these representations were false because Minerva and its attorneys had access to materials in the federal record showing otherwise, including:

(a)    Animal studies conducted by Minerva's engineers demonstrated that the silicone array sealed uterine perforations, preventing detection and creating risks of injury;

(b)    Minerva's PMA supplement (No. P140013/S005), submitted to the FDA in October 2016, requested approval for "the addition of a $CO_2$ extension tube," demonstrating Minerva's contemporaneous awareness of the defect and the need for a redesign;

(c)    Regulatory submissions, including FDA approval materials, together with Minerva's own documents acknowledged that reliable perforation detection was not optional but required to protect patient safety, confirming Defendants' awareness that safety risks were inherent in the original device;

(d)     Marketing materials created by Minerva emphasized that the redesigned device corrected this defect, but Minerva withheld those materials from healthcare providers after Peterson cautioned they could reveal a safety issue;

(e)     Sworn patent filings acknowledged that the original device "plugs the perforation" and could cause "very serious and potentially life-threatening" injury;

(f)     Patient studies showed zero bowel burns with the redesigned device compared to at least thirteen with the original device;

(g)     Exhibits showing the device's defect and risks, initially filed as confidential, became part of the public record when this Court denied requests to seal them;

(h)     Those exhibits were reviewed by Minerva and its attorneys, confirming their knowledge of the defect and associated risks;

(i)     A sworn statement to the USPTO, acknowledged by both this Court and the Tenth Circuit, affirmed that Minerva believed its patent representations were true;

(j)     After this Court and the Tenth Circuit acknowledged that Minerva signed its USPTO filings believing the statements within were true, Defendants changed their position on appeal;

(k)     Appellate admissions acknowledging that the original device caused patient injuries due to a known defect, after previously representing to this Court that there was "nothing unsafe" about the device;

(l)     The Tenth Circuit stated that "federal courts do not have power to review an arbitrator's factual findings" and that "we do not have discretion to overturn them";

(m)     Those admissions not only prevented accountability, they also secured this Court's confirmation of the award—even though Minerva represented to this Court there

was "nothing unsafe" about its original device and later changed positions on appeal by conceding that the device had a known defect that caused patient injuries;

(n)    Defendants' knowledge was further reinforced by Peterson's repeated safety warnings during his employment, internal discussions about patient injuries, and the development of the snorkel design to address the defect. These facts confirm that Defendants were aware of the defect and the risks it posed well before they invoked this Court's authority;

(o)    Minerva and Clapper swore under penalty of law to the USPTO that the original device contained a defect capable of causing "very serious and potentially life-threatening" injuries in order to obtain a patent on the redesign;

(p)    In federal court, Defendants reinforced the award's finding that there was "nothing unsafe" about the original device and argued that those factual determinations were beyond review. At the same time, Minerva's USPTO declarations acknowledged the opposite—that the device had a defect capable of causing serious injury. These irreconcilable positions presented to two different arms of the federal government undermined the integrity of judicial proceedings; and

(q)    Both this Court and the Tenth Circuit ultimately acknowledged which version was the truth: the sworn admissions to the USPTO that the original device had a defect capable of causing "very serious and potentially life-threatening" injuries.

**Element III: Interference with the Court's Function**

172.    Defendants' conduct interfered with this Court's ability to make an informed decision by:

(a)    submitting and relying on the arbitration award that stated there was "nothing unsafe" about the original device;

(b)     invoking the FAA's limits on judicial review, even though this Court acknowledged it could not evaluate the merits or review the arbitrator's factual findings, and the Tenth Circuit affirmed while stating that federal courts lack both the discretion and the power to do so;

(c)     converting an award resting on known falsehoods into a federal judgment by invoking this Court's Article III authority while preventing review of misconduct under the FAA's limits on judicial review; and

(d)     continuing to rely on these falsehoods in post-award proceedings, even after acknowledging that the original device's defect caused patient injuries.

173.    Because attorneys are officers of this Court, their deliberate advancement of false factual representations struck at the core of the judicial process. By presenting positions they knew to be false, they breached their professional obligations of candor and integrity toward the Court, impairing its ability to fairly administer justice.

174.    Minerva, though not itself an officer of the court, invoked this Court's authority through its attorneys and benefited from their actions. By relying on counsel to present known falsehoods, Minerva, Clapper, Pendlebury, and their attorneys undermined the adjudicative process and procured a judgment that would not have issued but for that misconduct.

175.    Attorneys are expected to advocate zealously for their clients, but only within the bounds of their professional responsibilities. Those duties include honesty toward the tribunal and candor in the presentation of evidence.

176.    GRSM50 attorneys Shapiro, Laurenson, and Eklof acted in that capacity in post-award proceedings yet violated those duties by advancing and defending factual representations they knew to be false.

177.    Their misconduct included violations of professional standards such as:

(a)    Rule 3.1, prohibiting attorneys from asserting claims or defenses not supported by fact or law;

(b)    Rule 3.3, requiring attorneys to correct the record when false evidence has been presented or relied upon;

(c)    Rule 4.1, prohibiting false statements of material fact or law to third parties; and

(d)    Rule 8.4(c), forbidding conduct involving dishonesty, fraud, deceit, or misrepresentation.

**Element IV: Damage**

178.    As a result of Defendants' conduct, this Court's authority was invoked to confirm an arbitration award that rested on known falsehoods, thereby converting a private award into an enforceable federal judgment.

179.    Fraud on the court harms the judicial process itself by undermining the integrity of proceedings and impairing the Court's ability to fairly administer justice. That systemic harm is compounded here by the entry of a judgment for $198,558.94 in attorney fees and costs that would not have issued but for Defendants' misconduct.

180.    The appropriate remedy for fraud on the court is equitable relief to protect the integrity of judicial proceedings, including setting aside the federal judgment and granting such further equitable relief as this Court deems necessary to preserve the integrity of its own proceedings.

## COUNT II: CIVIL CONSPIRACY

Supplemental State-law Claim Anchored to Fraud on the Court
Against All Defendants

181.   Peterson incorporates by reference all preceding paragraphs as if fully set forth herein.

182.   Under Kansas law, civil conspiracy requires: (1) two or more persons acted in concert; (2) they agreed to commit a wrongful act; (3) one or more overt acts were taken in furtherance of the agreement; and (4) the plaintiff suffered damages.

183.   This civil conspiracy claim is anchored to the fraud on the court alleged in Count I and arises from the same nucleus of operative fact, thereby falling within this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

184.   As alleged in Count I, Defendants committed fraud on the court by invoking this Court's authority to confirm an arbitration award that rested on a foundation of known falsehoods.

185.   Each element is satisfied by the following factual allegations.

**Element I: Two or More Persons**

186.   The conspiracy involved multiple Defendants, including Minerva, its executives Clapper and Pendlebury, the law firm GRSM50, and its attorneys Shapiro, Laurenson, and Eklof.

**Element II: Agreement to Commit a Wrongful Act**

187.   Defendants reached an agreement to secure a federal judgment through fraud on the court. Their shared objectives included:

(a)   representing to this Court that there was "nothing unsafe" about the original device despite knowledge of a defect that caused patient injuries;

(b)   discrediting Peterson's safety concerns as unreasonable to eliminate statutory whistleblower protections;

(c)   confirming the award through this Court's authority on that false premise;

(d)   relying on the FAA's emphasis on finality and judicial deference to arbitrators to prevent review of contrary evidence; and

(e)   converting an arbitration award obtained through known falsehoods into an enforceable judgment while understanding that this Court lacked both the power and the discretion to review the award.

188.   As part of their agreement, Defendants filed and relied on an arbitration award in this Court that asserted there was "nothing unsafe" about the original device, while sworn statements to the USPTO admitted the opposite—that the device contained a defect capable of causing "very serious and potentially life-threatening" injuries.

189.   Defendants also advanced mutually inconsistent positions: they told the courts that device safety was "completely irrelevant" while simultaneously acknowledging in appellate briefing that nearly all of Peterson's claims turned on whistleblower protection, which by law required a reasonable belief in a safety defect.

190.   Defendants employed these inconsistent positions as part of a coordinated strategy to secure judicial confirmation of the award on a false premise.

**Element III: Overt Acts in Furtherance**

191.   In furtherance of the conspiracy, Defendants committed overt acts that included:

(a)   submitting and relying on the arbitration award in this Court, knowing it stated there was "nothing unsafe" about the original device;

(b)   attaching the award to filings opposing Peterson's motion to vacate, thereby placing its "nothing unsafe" representations into the federal record;

(c)   arguing in post-award proceedings that contrary evidence was irrelevant and could not be reviewed, even while acknowledging that it was central to Peterson's claims;

(d)    moving this Court to confirm an award that rested on known falsehoods;

(e)    relying on the award's characterization of Peterson's whistleblowing as unreasonable in filings with this Court;

(f)    changing positions on appeal by conceding in briefing that the original device's defect caused patient injuries after this Court and the Tenth Circuit had acknowledged Minerva's sworn patent filings;

(g)    continuing to rely on known falsehoods, despite those concessions;

(h)    waiving the right to respond to Peterson's petition for certiorari in the United States Supreme Court, preserving the judgment and the false premise on which it rested;

(i)    invoking FAA limits that eliminated judicial power and discretion to review factual findings; and

(j)    invoking this Court's authority to confirm the award, thereby converting a private arbitration award into an enforceable federal judgment.

**Element IV: Damages**

192.    As a direct and proximate result of Defendants' conspiracy, Peterson suffered damages under Kansas law, including:

(a)    being subjected to a federal judgment that rested on known falsehoods;

(b)    losing the protection afforded to whistleblowers;

(c)    suffering reputational harm and loss of career opportunities;

(d)    experiencing emotional distress caused by enforcement of a judgment procured through coordinated falsehoods; and

(e)    incurring litigation expenses in responding to and attempting to correct Defendants' coordinated misconduct.

**Punitive Damages**

193.    Defendants acted with intent, malice, and reckless disregard for truth, fairness, and public safety. Their coordinated effort relied on the FAA's limits on judicial review and the deference given to arbitrators, thereby preventing consideration of their misconduct and resulting in judicial confirmation of an award resting on known falsehoods.

194.    Peterson seeks punitive damages under Kansas law to:

(a)    Deter parties from conspiring to misuse judicial proceedings by securing confirmation of awards resting on known falsehoods that courts cannot review under prevailing interpretations of the FAA;

(b)    Preserve the integrity of both arbitration as an alternative to litigation and the courts that enforce its outcomes; and

(c)    Reinforce accountability when parties coordinate to conceal public safety risks, evade responsibility, and retaliate against individuals who raise them in good faith to protect the public.

## COUNT III: AIDING AND ABETTING
Supplemental State-law Claim Anchored to Fraud on the Court
Against GRSM50, Laurenson, Eklof, and Shapiro

195.    Peterson incorporates by reference all preceding paragraphs as if fully set forth herein.

196.    Under Kansas law, aiding and abetting requires: (1) another committed an underlying wrongful act; (2) the defendant knew of that wrongful act; and (3) the defendant knowingly and substantially assisted in its commission.

197.    Like Count II, this aiding and abetting claim is anchored to the fraud on the court alleged in Count I and arises from the same nucleus of operative fact, thereby falling within this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

198.    As alleged in Count I, Defendants committed fraud on the court by invoking this Court's authority to confirm an arbitration award while relying on known falsehoods. That fraud included advancing positions in this Court that directly contradicted Minerva's sworn statements to the USPTO about the defect in its original device, and, after this Court had acknowledged the truth of those statements, later changing position on appeal and conceding in the Tenth Circuit that the device had a known defect that caused patient injuries.

199.    Each element is satisfied by the following factual allegations.

**Element I: Existence of Underlying Fraud**

200.    The underlying wrongful act was fraud on the court, committed when Defendants invoked this Court's authority to confirm an arbitration award while relying on factual representations known to be false, despite contrary evidence contained in the federal record.

201.    In appellate briefing, GRSM50 attorneys defending Minerva's position changed course and conceded that the original device had a defect that caused patient injuries. At the same time, they invoked the FAA's limits on judicial review to argue that this Court could not consider that

admission, while also asserting that nearly all of Peterson's claims depended on whistleblower protection, which required a reasonable belief that the original device posed a safety risk.

**Element II: Knowledge of the Fraud**

202.    GRSM50, Laurenson, Eklof, and Shapiro had actual or constructive knowledge of the underlying wrongful act. Their awareness is shown by, among other things:

    (a)    The PMA supplement requesting approval for "the addition of a $CO_2$ extension tube," reflecting contemporaneous awareness of the defect and need for redesign;

    (b)    Regulatory submissions and Minerva's own materials showing that reliable perforation detection was mandatory for patient safety;

    (c)    Sworn patent filings describing the defect and acknowledging that it created a likelihood of "very serious and life-threatening" injuries;

    (d)    Internal testing on animals confirming the defect, followed by patient testing that validated the defect resulted in injuries;

    (e)    Confidential marketing materials showing the redesign corrected a defect that masked perforations;

    (f)    Sales meeting disclosures acknowledging the defect and resulting injuries;

    (g)    Appellate briefing admitting the defect and its consequences;

    (h)    Reliance on the award's statement that there was "nothing unsafe," followed by later admissions that the device caused patient injuries;

    (i)    This Court's order acknowledging that Minerva had signed a sworn patent declaration believing its contents were true, and the Tenth Circuit's order supplementing the record with that evidence; and

(j)    Decisions to rely on the FAA's limits on judicial review across proceedings in this Court, the Tenth Circuit, and the United States Supreme Court.

**Element III: Substantial Assistance**

203.    GRSM50, Laurenson, Eklof, and Shapiro substantially assisted the fraud on the court by:

(a)    reinforcing false representations in briefing and argument;

(b)    characterizing Peterson's whistleblowing as unreasonable because there was "nothing unsafe" about the original device, despite later admissions confirming a known defect that caused patient injuries;

(c)    invoking this Court's authority to confirm the award while relying on the FAA's limits to prevent review of underlying falsehoods;

(d)    arguing that contrary evidence was irrelevant and could not be reviewed;

(e)    defending the judgment on appeal while asserting that device safety was "completely irrelevant," even as they acknowledged that nearly all of Peterson's claims turned on whistleblower protection;

(f)    waiving the right to respond to Peterson's petition for certiorari in the United States Supreme Court; and

(g)    continuing to rely on this Court's judgment confirming the award, even after changing position and conceding the defect and resulting patient injuries.

**Element IV: Damages**

204.    As a direct and proximate result, Peterson suffered damages under Kansas law, including:

(a)    A federal judgment that rested on known falsehoods;

(b)    Denial of whistleblower protections that would otherwise have applied;

(c)     Reputational harm and severe emotional distress from being falsely portrayed as dishonest and self-serving; and

(d)     Loss of a fair opportunity to present his claims.

**Punitive Damages**

205.    Defendants acted with malice and reckless disregard for truth, fairness, public safety, and their professional duties as officers of the court. Their conduct relied on the FAA's limits on judicial review and the deference given to arbitrators, thereby preventing consideration of their misconduct and resulting in judicial confirmation of an award resting on known falsehoods.

206.    Peterson seeks punitive damages under Kansas law to:

(a)     Deter attorneys from knowingly assisting in fraud on the court;

(b)     Uphold the integrity of judicial proceedings;

(c)     Prevent misuse of judicial authority to confirm arbitration awards resting on known falsehoods into enforceable judgments that courts cannot review under prevailing interpretations of the FAA; and

(d)     Ensure accountability for legal professionals who fail to honor their duties as officers of the court.

## PRAYER FOR RELIEF

WHEREFORE, Peterson requests judgment against Defendants and the following relief:

1. As to Count I (Fraud on the Court): equitable relief setting aside the December 8, 2023, judgment confirming the arbitration award of $198,558.94, and granting such further equitable relief as this Court deems necessary to protect the integrity of its proceedings;

2. As to Counts II and III (Civil Conspiracy and Aiding and Abetting): compensatory damages, consequential damages, and punitive damages under Kansas law.

3. Attorneys' fees and costs as provided by law; and

4. All further relief the Court deems just and proper.

## JURY TRIAL DEMAND

Peterson requests that Count I (Fraud on the Court) be decided by the Court as an equitable claim and demands a trial by jury on all issues triable under Counts II and III.

Respectfully submitted,

Daniel E. Peterson
Pro Se
14064 W. 141st Ter.
Olathe, Kansas 66062
dpeterson@equalfight.org
Telephone: (913) 221-5936

October 7, 2025